FILED
At Albuquerque NM

DEC 0 1 2015

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CRIMINAL NO. 15-4265 JH |
| ) | |
| vs. ) | Counts 1: 18 U.S.C. § 1341: Frauds |
| ) | and Swindles; |
| MATTHEW DALE SAMPLE, ) | |
| ) | Count 2: 18 U.S.C. § 1343: Wire |
| Defendant. ) | Fraud. |

# INFORMATION

The United States Attorney charges:

## Introduction

1. In or about December 2008, Defendant **MATTHEW DALE SAMPLE** formed The Lobo Volatility Fund, LLC ("Lobo"), a Delaware limited liability company, to operate as a hedge fund. At the time Lobo was formed, **SAMPLE** was an experienced investment advisor and was associated with a broker-dealer firm that was registered with the Securities and Exchange Commission.

2. In forming Lobo, **SAMPLE** arranged for the hedge fund's managing member to be Lobo GM, LLC ("Lobo GM") and its investment manager to be Roadrunner Capital Management, LLC ("Roadrunner Capital"). In addition to Lobo, **SAMPLE** controlled both Lobo GM and Roadrunner Capital.

3. From in or about October 2009, through June 2012, **SAMPLE** raised approximately $1 million dollars through the sale of "limited liability units" of Lobo to investors in Santa Fe, New Mexico and elsewhere. Sample represented to investors that he intended to

make profits for both himself and the investors by using an alleged improved version of an options trading program that he had unsuccessfully utilized in the past.

4.  According to the subscription agreement that **SAMPLE** provided to investors in Lobo, Roadrunner Capital, as manager, was entitled to a monthly management fee equal to 1/2 of 1% of Lobo's net asset value, 20% of trading profits, and limited expenses. The agreement explicitly precluded Lobo from paying either Lobo GM or Roadrunner Capital any salary, fringe benefits, or reimbursement for overhead expenses.

5.  As part of the subscription agreement, **SAMPLE**, as manager, was precluded from doing any act which would make it impossible for Lobo from carrying out its ordinary business.

6.  In managing the Lobo hedge fund, **SAMPLE** was also expected periodically to provide investors with truthful and accurate financial progress reports about Lobo and the investors' financial positions in the hedge fund.

Count 1

7.  Paragraphs 1 through 6 above are hereby incorporated as if set forth herein.

8.  Between in or about October 15, 2009, through in or about June 25, 2012, in the District of New Mexico and elsewhere, **SAMPLE** knowingly and intentionally devised a scheme and artifice to defraud and to obtain money and property by means of materially false pretenses and representations. For the purpose of executing his scheme and artifice, **SAMPLE** knowingly caused to be delivered by mail according to the direction thereon certain mail matter as further described below.

The Scheme and Artifice

9. **SAMPLE** solicited approximately four investors to invest in Lobo. In or about March 31, 2010, **SAMPLE** solicited a husband and wife, who then lived in Santa Fe, New Mexico, to invest in **SAMPLE**'s Lobo hedge fund. These individuals are hereinafter referred to as the "Santa Fe couple." The Santa Fe couple initially invested $50,000 in Lobo on March 31, 2010. Through June 25, 2012, the Santa Fe couple ultimately invested a total of approximately $690,000 in **SAMPLE**'s Lobo hedge fund.

10. Contrary to his duties as fund manager and to the representations **SAMPLE** made to the investors about investing their funds, in reality, almost immediately after receiving funds from his investors to invest in Lobo, **SAMPLE** diverted a significant percentage of those funds to his personal use. **SAMPLE** transferred investors' funds to personal accounts, and spent the proceeds on such things as credit card payments, retail purchases, meals and entertainment, home renovations and travel.

11. From approximately October 2009 to at least April 2013, **SAMPLE** failed to disclose that he had misappropriated his Lobo investors' funds, and instead provided his investors with false verbal and/or written assurances that the funds were being traded profitably and/or that their funds were being held in capital accounts for them. For example, at the end of the 2011 tax year, **SAMPLE** created at least two false IRS Forms K-1, which he provided to respective investors, including the Santa Fe couple. The K-1 form that **SAMPLE** provided to the Santa Fe couple falsely reflected a capital balance of $739,180 in the Santa Fe couple's account when, in reality, **SAMPLE** had lost or misappropriated a significant amount of those funds. To further help prevent detection of the scheme to defraud, and to induce the Santa Fe couple to continue to send **SAMPLE** more money, **SAMPLE** also mailed, using the United

States Postal Service, monthly false statements to the Santa Fe couple's residence in Santa Fe, New Mexico.

12. In the months prior to and including June 2012, the Santa Fe couple made repeated requests to **SAMPLE**, instructing him that they wished to withdraw approximately $500,000 of the funds they had invested. **SAMPLE** provided various false excuses to the Santa Fe couple as to why he could not make a distribution to them. One such false excuse given by **SAMPLE** was that he could not withdraw funds from a certain account because of contractual restrictions with the financial institution. Another false excuse **SAMPLE** gave was that he had to liquidate a particular investment in order to obtain the funds.

13. On or about June 23, 2012, **SAMPLE** schemed to make a capital distribution to the Santa Fe couple by knowingly depositing a $100,000 check drawn on a closed bank account into one of his business accounts. As he knew, the check was worthless, and the financial institution refused to negotiate it.

14. In or about June 2012, **SAMPLE** solicited another Illinois investor, herein identified by the initials, B.R., to invest in **SAMPLE**'s Lobo hedge fund. **SAMPLE** falsely represented to B.R. that B.R.'s funds would be used by Lobo to trade securities in an effort to make a profit for the investor. On or about June 25, 2012, B.R. wired **SAMPLE** $50,000 to purchase a position in the Lobo fund. On or about that same day, however, **SAMPLE** instead used B.R.'s funds to make a payment disguised as a $50,000 capital distribution to the Santa Fe couple, which represented approximately half of a $100,000 distribution that **SAMPLE** had promised them. **SAMPLE** never repaid the $50,000 from B.R. that he had transferred to the Santa Fe couple.

15. On or about June 26, 2012, **SAMPLE** wrote another $50,000 check to the Santa Fe couple from an account affiliated with **SAMPLE**, and not Lobo. The check represented the remaining $50,000 that **SAMPLE** had promised the Santa Fe couple, but the check failed to clear the financial institution upon which it was drawn due to insufficient funds.

The Mailing

16. For the purpose of executing his scheme and artifice, on or about May 1, 2012, **SAMPLE** knowingly caused to be delivered by mail according to the direction thereon mail matter containing a fraudulent Lobo statement. The Lobo statement was delivered by the United States Postal Service to the Santa Fe couple at their home in Santa Fe, New Mexico. The statement failed to disclose the material information that **SAMPLE** had improperly diverted the Santa Fe couple's investment funds to purposes other than trading, and falsely portrayed to the Santa Fe couple trading profits on their investment funds in Lobo in that it falsely purported to show that the Santa Fe couple still had a balance of approximately $715,603.37 invested in Lobo.

In violation of 18 U.S.C. § 1341.

Count 2

17. Paragraphs 1 through 6 above are hereby incorporated as if set forth herein.

18. Between in or about August 8, 2008, through in or about April 1, 2014, in the District of New Mexico and elsewhere, Defendant **MATTHEW DALE SAMPLE** knowingly and intentionally devised a scheme and artifice to defraud and to obtain money and property by means of materially false pretenses and representations. For the purpose of executing his scheme and artifice, **SAMPLE** knowingly transmitted and caused to be transmitted by means of wire, radio and television communication in interstate commerce, certain writings, signs and signals, as further described below. The aspects of **SAMPLE**'s scheme and artifice to defraud relating to

Count 2 did not specifically target investors in Lobo, but they did share certain hallmark features with the Lobo aspects of his scheme while overlapping in time with the Lobo part of the scheme.

### The Scheme and Artifice

19. In the mid 2000's, **SAMPLE** worked as a financial investment advisor for an investor who is hereafter identified by the initials P.C. According to P.C., P.C. engaged **SAMPLE** to invest and manage approximately $600,000 for P.C.. P.C. understood that **SAMPLE** originally invested a portion of P.C.'s money in a hedge fund that **SAMPLE** controlled called the Vega Fund. The Vega fund later failed.

20. After the Vega fund failed, **SAMPLE** led P.C. to believe that **SAMPLE** had invested the remainder of P.C.'s money in multiple endeavors that had been funded from a Charles Schwab bank in P.C.'s name that was held at a trading firm called Broad Street International ("BSI"). To that end, as part of a scheme to defraud P.C., **SAMPLE** provided P.C. with quarterly statements which led P.C. to believe his funds were invested in a 401k style profit sharing account, a BSI Capital account and an IRA. The documentation that **SAMPLE** provided to P.C. was false.

21. As a further part of his scheme to defraud, on or about August 8, 2008, **SAMPLE** arranged for a wire transfer of approximately $125,000 of P.C.'s money to be sent from P.C.'s Charles Schwab account to a Wells Fargo account titled "Sample Investment Partners," which was an account that **SAMPLE** had opened and controlled.

22. As a further part of his scheme to defraud, on or about September 5, 2008, **SAMPLE** arranged for another wire transfer of approximately $17,000 of P.C.'s money to be sent from P.C.'s Charles Schwab account to the Wells Fargo account titled "Sample Investment Partners" that **SAMPLE** controlled.

23. As a further part of his scheme to defraud, on or about September 5, 2008, **SAMPLE** arranged for another wire transfer of approximately $17,000 of P.C.'s money to be sent from P.C.'s Charles Schwab account to the Wells Fargo account titled "Sample Investment Partners" that **SAMPLE** controlled.

24. As a further part of his scheme to defraud, on or about April 9, 2009, **SAMPLE** also arranged for a wire transfer of approximately $310,696.05 of P.C.'s money to be sent from P.C.'s Charles Schwab account to a Wells Fargo account titled "Sample investments Partners III FBO P.C.'s business" which was another account that **SAMPLE** had opened and controlled.

25. After transferring P.C.'s money into bank accounts that he controlled, **SAMPLE** subsequently diverted at least $363,696.05 of P.C.'s money to **SAMPLE's** personal use.

26. In furtherance of his scheme, on or about November 14, 2012, **SAMPLE** registered the website www.bsicap.com.

27. **SAMPLE** subsequently referred P.C. to the www.bsicap.com website so that P.C. could supposedly monitor the monies that **SAMPLE** had falsely led P.C. to believe were being held in P.C.'s alleged BSI accounts. **SAMPLE** posted false BSI account statements on the www.bsicap.com website for P.C. to review to help prevent P.C. from discovering that **SAMPLE** had diverted P.C.'s monies to **SAMPLE's** personal use.

28. To further help prevent detection of the scheme to defraud, **SAMPLE** provided P.C. with false quarterly statements and e-mail updates about P.C.'s purported investments. For example, in an email dated January 21, 2010, titled "Yearly Returns," **SAMPLE** told P.C.:

> "Just mailed the year ends yesterday. I had provided Jodie with the updated phone number here in New Mexico, 505-850-XXXX. Just wanted to make sure you had it. Formally affiliated with Roadrunner Capital in Albuquerque per our earlier conversation. Will be in Chicago in early February and would like to meet. Let me know what would work for you the week of February 9th. If you could send me a copy of all docs regarding the Lincoln Trust issue to Matthew Sample PO BOX XXXXX Santa Fe NM 87594. Will

take care of mailing to house also. I am still depressed about Duke losing at NC State Wednesday. Matthew."

29. In an email dated April 4, 2011, titled "Weekly Update," **SAMPLE** told P.C.:

"Just wanted to send you a quick update. Rising oil prices are now starting to have an effect on company profits as the increased cost to producers as well as the increased cost to producers as well as the increased cost to the consumers will start to affect disposable income. The markets have recovered somewhat since the Japanese tsunami but several dangers remain. We are still in a defensive posture. Matthew"

30. In an email dated Februray 25, 2011, titled "Weekly Update," **SAMPLE** told

P.C.:

As you may be aware, the turmoil in the middle east has escalated to Libya which has a more direct impact on ol prices and supply that the recent unrest in Egypt. The market has been lower each day this week, including big moveslower on Tuesday and Wed. having a higher level of cash in the portfolio has caused us to undererform the previous few months. But the higher levels of cash will help cushion any downturn. We believe the markets may have a correction of 5-10% in the next few months. If that occurs, we stand ready to put further cash to work on the weakness. On the green front, we purchased shares of AERT or Advanced Envoirnmental Recycling Technologies. It is a very small company buththought you would find it of interest. Let me know if you have any questions. Sincerely, Matthew Sample"

31. To further help prevent detection of the scheme to defraud, **SAMPLE** also provided P.C. with false statements about P.C.'s purported investments using the United States Postal Service.

## The Wire

32. For the purpose of executing his scheme and artifice, on or about February 25, 2011, **SAMPLE** knowingly transmitted and caused to be transmitted by means of wire, radio and television communication in interstate commerce, a writing, sign and signal, to wit, an email entitled "Weekly Update" which was designed to lull P.C. into believing that **SAMPLE** was conscientiously paying attention to the world markets in order to assure P.C. that P.C.'s funds remained well invested and safe.

In violation of 18 U.S.C. § 1343.

                                                    DAMON P. MARTINEZ
                                                    United States Attorney

                                                    FRED J. FEDERICI
                                                    Assistant United States Attorney