IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

*FILED*
At Albuquerque NM
DEC 0 1 2015
MATTHEW J. DYKMAN
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cr. No. 15-4265 JH |
| | ) |
| MATTHEW DALE SAMPLE, | ) |
| Defendant. | ) |

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties notify the Court of the following agreement between the United States Attorney for the District of New Mexico, the Defendant, Matthew Dale Sample, and the Defendant's counsel, Ray Twohig:

### REPRESENTATION BY COUNSEL

1.      The Defendant understands the Defendant's right to be represented by an attorney and is so represented.  The Defendant has thoroughly reviewed all aspects of this case with the Defendant's attorney and is fully satisfied with that attorney's legal representation.

### RIGHTS OF THE DEFENDANT

2.      The Defendant further understands the Defendant's rights:

  a.      to be prosecuted by indictment;

  b.      to plead not guilty, or having already so pleaded, to persist in that plea;

  c.      to have a trial by jury; and

  d.      at a trial:

    1)      to confront and cross-examine adverse witnesses,

2)      to be protected from compelled self-incrimination,

3)      to testify and present evidence on the Defendant's own behalf, and

4)      to compel the attendance of witnesses for the defense.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

3.      The Defendant agrees to waive these rights and to plead guilty to Count 1 of the

information, charging Frauds and Swindles in violation of 18 U.S.C. § 1341, and Count 2 of the

information charging Wire Fraud in violation of 18 U.S.C. § 1343.

### SENTENCING

4.      The Defendant understands that the maximum penalty provided by law for each

of the two counts of the information is:

a.      imprisonment for a period of not more than twenty (20) years;

b.      a fine not to exceed the greater of $250,000 or twice the pecuniary gain to
        the Defendant or pecuniary loss to the victim;

c.      a term of supervised release of not more than three years to follow any
        term of imprisonment.  (If the Defendant serves a term of imprisonment, is
        then released on supervised release, and violates the conditions of
        supervised release, the Defendant's supervised release could be revoked –
        even on the last day of the term – and the Defendant could then be
        returned to another period of incarceration and a new term of supervised
        release.);

d.      a mandatory special penalty assessment of $100.00; and

e.      restitution as may be ordered by the Court.

2

5.      The parties recognize that the federal sentencing guidelines are advisory, and that the Court is required to consider them in determining the sentence it imposes.

## DEFENDANT'S ADMISSION OF FACTS

6.      By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense(s) to which I am pleading guilty.  I recognize and accept responsibility for my criminal conduct.  Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense(s) to which I am pleading guilty beyond a reasonable doubt, including any facts alleged in the information that increase the statutory minimum or maximum penalties.  I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct:

7.      With respect to Count 1 of the information filed against me, I admit that between in or about October 15, 2009, through in or about June 25, 2012, in the District of New Mexico and elsewhere, I commingled investor funds and my own for the purposes of trading options and making profits for the investors and myself, but after initial losses in the strategy, I intentionally misrepresented the status of the investment and performance while investors continued to provide me with funds to invest.  By so doing, I knowingly and intentionally devised a scheme and artifice to defraud and to obtain money and property by means of materially false pretenses and representations.  For purposes of executing my scheme and artifice, I knowingly caused to be delivered by mail according to the direction thereon certain mail matter as further described below.

8.      By way of background, in or about December 2008, I formed The Lobo Volatility Fund, LLC ("Lobo"), a Delaware limited liability company, to operate as a hedge fund at the

3

request of V.G. of Albuquerque.  Through a mutual friend who introduced us, V.G. said he

would raise money from his base of previous real estate investors and I would manage the fund

as I no longer had extensive contacts with available funds.  At the time Lobo was formed, I was

an experienced investment advisor and was associated with a broker-dealer firm that was

registered with the Securities and Exchange Commission. The Fund Documents were prepared

by a reputable Denver Securities Firm, and the Fund was properly registered in the state of

Delaware.

9.      In forming Lobo, I arranged for the hedge fund's managing member to be Lobo

GM, LLC ("Lobo GM") and its investment manager to be Roadrunner Capital Management,

LLC ("Roadrunner Capital").  In addition to Lobo, I controlled both Lobo GM and Roadrunner

Capital.

10.      From in or about October 2009, through June 2012, I raised approximately

$932,000 through the sale of "limited liability units" of Lobo to investors in Santa Fe, New

Mexico, and elsewhere.  I represented to investors that I intended to make profits for both myself

and the investors by using an improved version of an options trading program that I had

successfully used while I was employed at a trading firm called UBS operating a fund called

Vega, until the Vega collapse in August 2007 (arbitration pending as a plaintiff).

11.      Per the subscription agreement that I provided to investors in Lobo and

Roadrunner Capital, I, as manager, was entitled to a monthly management fee equal to 1/12 of 1

percent of Lobos' net asset value, 20 percent of trading profits, and limited organizational and

maintenance expenses.  The agreement explicitly precluded Lobo from paying either Lobo GM

or Roadrunner Capital any salary, fringe benefits, or reimbursement for overhead expenses.

12.      As part of the subscription agreement, I, as manager, was precluded from

4

engaging in any act that would make it impossible for Lobo from carrying out its ordinary business.

13.     In managing the Lobo hedge fund, I was also expected to periodically provide investors with truthful and accurate financial progress reports about Lobo and the investors' financial positions in the hedge fund.  Initially, I did deliver accurate statements but after market losses during several volatile market periods, I did not disclose the losses and instead created false statements showing modest growth.

14.     I solicited three initial investors to invest in Lobo.  In or about March 31, 2010, I solicited a husband and wife, who then lived in Santa Fe, New Mexico, to invest in my Lobo hedge fund.  These individuals are hereinafter referred to as the "Santa Fe couple."  The Santa Fe couple initially invested $50,000 in Lobo on March 31, 2010.  Through June 25, 2012, the Santa Fe couple ultimately invested a total of approximately $690,000 in various installments in the Lobo hedge fund.

15.     Contrary to my duties as fund manager and to the representations I made to the investors about investing their funds, in reality, almost immediately after receiving funds from the investors to invest in Lobo, I commingled investor assets and my own money causing only $605,000 of the investor money to be either wired to trading firms for investment or repayments to investors.  Approximately $315,000, or 33 percent, was never actually invested.  I improperly used these funds for my own use.  While I was entitled to a management fee and share of profits (as there were profits at numerous points based on the time weighted value of the deposits that would further reduce the improperly taken amount), I was not entitled to take anywhere near this amount for my own use.  I intended to return these funds once I had enough investors generating the required profits to the manager to repay, but I also knew that it was not legal for me to take

the money for my own use and then lie to the investors about their investments. In addition after all funds were lost, I obtained gainful employment in an attempt to create a revenue stream to repay investors.

16.    From approximately October 2009 to at least April 2013, I also gave my investors in Lobo false verbal and/or written assurances that I was trading profitably and/or that their funds were being held in capital accounts for them. For example, at the end of the 2011 tax year, I created at least two false IRS Forms K-1, which I provided to respective investors including the Santa Fe couple. The K-1 form that I provided to the Santa Fe couple falsely reflected a capital balance of $739,180 in the Santa Fe couple's account when, in reality, I had lost or misappropriated most or all of their funds. To further help prevent detection, I also mailed, using the United States Postal Service, monthly false statements to the Santa Fe couple's residence in Santa Fe, New Mexico.

17.    In the months prior to and including June 2012, the Santa Fe couple made repeated requests to me instructing me that they wished to withdraw approximately $500,000 of the funds they had invested. I provided various false excuses to the Santa Fe couple as to why I could not make a distribution to them. One such false excuse that I gave was that I could not withdraw funds from a certain account because of contractual restrictions with the financial institution. Another false excuse I gave was that I had to wait until specific option months had ended for specific option series.

18.    On or about June 23, 2012, after repeated requests from the couple, I made a capital distribution to the Santa Fe couple by knowingly depositing a $100,000 check drawn on a closed bank account into one of my business accounts. As I knew, the check was worthless, and the financial institution refused to negotiate it.

6

19.    In or about June 2012, I solicited another Illinois investor, herein identified by the initials, B.R., to invest in my Lobo hedge fund.  I falsely represented to B.R. that B.R.'s funds would be used by Lobo to trade securities in an effort to make a profit for the investor.  On or about June 25, 2012, B.R. wired me $50,000 to purchase a position in the Lobo fund.  On or about that same day, however, I instead used B.R.'s funds to make a payment disguised as a $50,000 capital distribution to the Santa Fe couple, which represented approximately half of a $100,000 distribution that I had promised them.  I never repaid the $50,000 from B.R. that I had transferred to the Santa Fe couple.

20.    On or about June 26, 2012, I wrote another $50,000 check to the Santa Fe couple from an account affiliated with me, and not Lobo.  The check represented the remaining $50,000 that I had promised the Santa Fe couple, but the check failed to clear the financial institution upon which it was drawn due to insufficient funds.

21.    On or about May 1, 2012, I knowingly caused to be delivered by mail according to the direction thereon mail matter containing a fraudulent Lobo statement.  The Lobo statement was delivered by the United States Postal Service to the Santa Fe couple at their home in Santa Fe, New Mexico, and it falsely purported to show that the Santa Fe couple still had a balance of approximately $715,603.37 invested in Lobo.

22.    With respect to Count 2 of the information filed against me, between in or about August 8, 2008, through in or about April 1, 2014, in the District of New Mexico and elsewhere, I knowingly and intentionally devised a scheme and artifice to defraud and to obtain money and property by means of materially false pretenses and representations.  For the purpose of executing the scheme and artifice, I knowingly transmitted and caused to be transmitted by means of wire, radio and television communication in interstate commerce certain writings, signs

7

and signals, as further described below.  My conduct with respect to Count 2 of the information did not directly involve investors in Lobo, but was part of the same pattern of conduct.

23.     By way of more background, in the mid-2000's, I worked as a financial investment advisor for an investor who is hereafter identified by the initials P.C.  P.C. engaged me to invest and manage approximately $600,000 for P.C.  P.C. understood that I originally invested a portion of P.C.'s money in a hedge fund that I controlled called the Vega Fund.  The Vega Fund later lost significant value in the August 2007 financial crisis and was closed.

24.     After the Vega Fund lost significant value in the August 2007 financial crisis and was closed, I led P.C. to believe that I had invested the remainder of P.C.'s money in multiple endeavors that had been funded from a Charles Schwab bank in P.C.'s name that was held at Roadrunner Capital and Lobo since I controlled these entities.  To that end, I provided P.C. with quarterly statements that led P.C. to believe his funds were invested in a 401k-style profit sharing account, a joint account, and an IRA.  The documentation that I provided to P.C. was false.

25.     On or about August 8, 2008, I arranged for a wire transfer of approximately $125,000 of P.C.'s money to be sent from P.C.'s Charles Schwab account to a Wells Fargo account titled "Sample Investment Partners," which was then wired to a trading account at Penson/Think or Swim, an account that I had opened and controlled and for which I had written discretion to trade and move funds.

26.     On or about September 5, 2008, I arranged for another wire transfer of approximately $17,000 of P.C.'s money to be sent from P.C.'s Charles Schwab account to the Wells Fargo account titled "Sample Investment Partners" that I controlled.

27.     On or about April 9, 2009, I also arranged for a wire transfer of approximately $310,696.05 of P.C.'s money to be sent from P.C.'s Charles Schwab account to a Wells Fargo

8

account titled "Sample investments Partners III FBO P.C.'s business" which was another account

that I had opened and controlled. I then commingled those funds with $100,000 of my own in

the Sample investments account and wired funds to trade at Options Xpress.

28.     After transferring P.C.'s money into bank accounts that I controlled, I unlawfully

diverted at least $150,000 to my own personal use.

29.     I had a relationship – uninvolved with Lobo or P.C. – with a trading firm  BSI

Capital (later found to be a Ponzi/ fraudulent firm – current lawsuit pending).  A website that

had been registered with my knowledge for another purpose, www.bsicap.com was being used

by BSI Capital for trade reporting statements.

30.     After P.C. demanded contact with the clearing firm that held his accounts, I

panicked and used a login I was provided to post fictitious statements on the BSI website for his

view.

31.     I provided P.C. with false quarterly statements and e-mail updates about P.C.'s

purported investments.  For example, in an email dated January 21, 2010, titled "Yearly

Returns," I told P.C.:

> "Just mailed the year ends yesterday.  I had provided Jodie with the updated phone
> number here in New Mexico, 505-850-XXXX.  Just wanted to make sure you had it.
> Formally affiliated with Roadrunner Capital in Albuquerque per our earlier conversation.
> Will be in Chicago in early February and would like to meet.  Let me know what would
> work for you the week of February 9th.  If you could send me a copy of all docs regarding
> the Lincoln Trust issue to Matthew Sample PO BOX XXXXX Santa Fe NM 87594.  Will
> take care of mailing to house also.  I am still depressed about Duke losing at NC State
> Wednesday.  Matthew."

32.     In an email dated April 4, 2011, titled "Weekly Update," I also told P.C.

> "Just wanted to send you a quick update.  Rising oil prices are now starting to have an
> effect on company profits as the increased cost to producers as well as the increased cost
> to producers as well as the increased cost to the consumers will start to affect disposable

income. The markets have recovered somewhat since the Japanese tsunami but several dangers remain. We are still in a defensive posture. Matthew"

33.     In an email dated February 25, 2011 that I sent to P.C., which I titled "Weekly Update," I told P.C.:

> As you may be aware, the turmoil in the middle east has escalated to Libya which has a more direct impact on oi prices and supply that the recent unrest in Egypt. The market has been lower each day this week, including big moveslower on Tuesday and Wed. having a higher level of cash in the portfolio has caused us to undererform the previous few months. But the higher levels of cash will help cushion any downturn. We believe the markets may have a correction of 5-10% in the next few months. If that occurs, we stand ready to put further cash to work on the weakness. On the green front, we purchased shares of AERT or Advanced Envoirnmental Recycling Technologies. It is a very small company buththought you would find it of interest. Let me know if you have any questions. Sincerely, Matthew Sample"

34.     I also provided P.C. with false statements about P.C.'s purported investments using the United States Postal Service to deliver the statements.

35.     On or about February 25, 2011, I knowingly transmitted and caused to be transmitted by means of wire, radio and television communication in interstate commerce, a writing, sign and signal, to wit, an email entitled "Weekly Update," which was meant to convey that I was conscientiously paying attention to the world markets in order to assure P.C. that P.C.'s funds remained well invested and safe.

36.     By signing this agreement, the Defendant admits that there is a factual basis for each element of the crime(s) to which the Defendant is pleading guilty. The Defendant agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the Defendant's sentence, including, but not limited to, the advisory guideline offense level.

37.     Defendant proffers that based on the above statement he has clearly recognized and affirmatively accepted personal responsibility for his criminal conduct. Consequently,

Defendant believes that, pursuant to U.S.S.G. § 3E1.1(a), so long as the Defendant continues to accept responsibility for the Defendant's criminal conduct, the Defendant is entitled to a reduction of two levels from the base offense level as calculated under the sentencing guidelines, and if applicable, a reduction of an additional offense level pursuant to U.S.S.G. § 3E1.1(b).

## RECOMMENDATIONS

38.    Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend as follows:

a.    The parties do not agree either upon the amount of loss under USSG § 2B1.1 for which the Defendant should be held accountable for sentencing purposes, nor upon the principal amount of restitution that the Defendant owes to the victims of the Defendant's mail and wire fraud scheme. However, the Defendant recognizes and agrees that the total loss amount for which the Defendant should be held accountable under USSG § 2B1.1 includes losses beyond the loss amounts of the two particular offenses to which the Defendant is entering a plea of guilty, and specifically includes the fraud losses resulting to the victims from all of the Defendant's criminal conduct related to this case.  The Defendant acknowledges that his scheme to defraud investors extended beyond the victims identified in the two counts of conviction and should include full restitution to all the victims identified in submissions the Defendant has previously made to the Securities and Exchange Commission, including in the Defendant's affidavit to the SEC that is dated June 2, 2014.  Defendant asserts that the loss figure for which he should be held accountable for both sentencing

11

purposes under USSG § 2B1.1(b)(1) and for restitution purposes should
be in the principal amount of not more than (and perhaps less than)
approximately $641,513. The United States asserts that the loss figure
for which the Defendant should be held accountable for both sentencing
purposes under USSG § 2B1.1(b)(1) and for restitution purposes exceeds
$1,000,000. The parties and the victims will have an opportunity to
present further information to the Court about their views of the
appropriate final loss and restitution amounts in connection with the
sentencing hearing.

b.     The United States will recommend that the Defendant be sentenced at the
low end of the advisory sentencing guideline range that accords with the
United States' view of the correctly calculated guideline range prior to
the resolution of any disputed sentencing factors.

c.     The Defendant understands that the above recommendations are not
binding on the Court and that whether the Court accepts these
recommendations is a matter solely within the discretion of the Court after
it has reviewed the presentence report. Further, the Defendant understands
that the Court may choose to vary from the advisory guideline sentence. If
the Court does not accept any one or more of the above recommendations
and reaches an advisory guideline sentence different than expected by the
Defendant, or if the Court varies from the advisory guideline range, the
Defendant will not seek to withdraw the Defendant's plea of guilty. In

12

other words, regardless of any of the parties' recommendations, the
Defendant's final sentence is solely within the discretion of the Court.

39.     Apart from the recommendations set forth in this plea agreement, the United
States and the Defendant reserve their rights to assert any position or argument with respect to all
aspects of the sentence to be imposed, including, but not limited to, the facts and the applicability
of particular sentencing guidelines, adjustments under the guidelines, departures or variances
from the guidelines, and the application of factors in 18 U.S.C. § 3553(a).

40.     Regardless of any other provision in this agreement, the United States reserves the
right to provide to the United States Pretrial Services and Probation Office and to the Court any
information the United States believes may be helpful to the Court, including, but not limited to,
information about the recommendations contained in this agreement and any relevant conduct
under U.S.S.G. § 1B1.3.

## DEFENDANT'S ADDITIONAL AGREEMENT

41.     The Defendant understands the Defendant's obligation to provide the United
States Pretrial Services and Probation Office with truthful, accurate, and complete information.
The Defendant represents that the Defendant has complied with and will continue to comply with
this obligation.

42.     Except under circumstances where the Court, acting on its own, fails to accept
this plea agreement, the Defendant agrees that, upon the Defendant's signing of this plea
agreement, the facts that the Defendant has admitted under this plea agreement as set forth
above, as well as any facts to which the Defendant admits in open court at the Defendant's plea
hearing, shall be admissible against the Defendant under Federal Rule of Evidence 801(d)(2)(A)
in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the

13

Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

## RESTITUTION

43.     The Defendant agrees and acknowledges that, as part of the Defendant's sentence, the Court is not limited to ordering restitution only for the amount involved in the particular offense or offenses to which the Defendant is entering a plea of guilty, but may and should order restitution resulting from all of the Defendant's criminal conduct related to this case. In this case, the Defendant acknowledges that his criminal conduct extended beyond the victims identified in the two counts of conviction and should include full restitution of sums lost due to his criminal conduct to all the victims identified in submissions the Defendant has previously made to the Securities and Exchange Commission, including in the Defendant's affidavit dated June 2, 2014. The final restitution figure shall be determined by the Court. Defendant began making partial restitution payments to victims identified in paragraph 16 of Defendant's affidavit to the Securities and Exchange Commission dated June 2, 2014, in July/August 2015. Contingent upon Defendant providing proof of such restitution payments made to the Court's satisfaction, the United States agrees that Defendant should receive credit against the overall restitution amount determined at the time of sentencing for these partial restitution payments and any future restitution payments Defendant makes prior to sentencing.

## WAIVER OF APPEAL RIGHTS

44.     The Defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed. Acknowledging that, the Defendant knowingly waives the right to appeal the Defendant's conviction(s) and any sentence, including any fine, within the statutory maximum authorized by law, as well as any order of

14

restitution entered by the Court.  In addition, the Defendant agrees to waive any collateral attack

to the Defendant's conviction(s) and any sentence, including any fine, pursuant to 28 U.S.C. §§

2241 or 2255, or any other extraordinary writ, except on the issue of counsel's ineffective

assistance in negotiating or entering this plea or this waiver.  The appellate waiver in this plea

agreement does not bar the defendant from seeking a sentence reduction pursuant to 18 U.S.C. §

3582(c), should the Sentencing Commission so authorize.

## GOVERNMENT'S ADDITIONAL AGREEMENT

45.     Provided that the Defendant fulfills the Defendant's obligations as set out above,

the United States agrees that the United States will not bring additional criminal charges against

the Defendant arising out of the facts forming the basis of the present information.  In addition,

with respect to those victims who Defendant previously identified in his July 2, 2014 affidavit to

the SEC who have not also been described within the present information, the United States will

not bring additional charges against Defendant arising out of the facts forming the basis for the

Court's final restitution order.

46.     This agreement is limited to the United States Attorney's Office for the District of

New Mexico and does not bind any other federal, state, or local agencies or prosecuting

authorities.

## VOLUNTARY PLEA

47.     The Defendant agrees and represents that this plea of guilty is freely and

voluntarily made and is not the result of force, threats, or promises (other than the promises set

forth in this agreement and any addenda).  There have been no promises from anyone as to what

sentence the Court will impose.  The Defendant also represents that the Defendant is pleading

guilty because the Defendant is in fact guilty.

15

## VIOLATION OF PLEA AGREEMENT

48.     The Defendant agrees that if the Defendant violates any provision of this agreement, the United States may declare this agreement null and void, and the Defendant will thereafter be subject to prosecution for any criminal violation, including but not limited to any crime(s) or offense(s) contained in or related to the charges in this case, as well as perjury, false statement, obstruction of justice, and any other crime committed by the Defendant during this prosecution.

## SPECIAL ASSESSMENT

49.     At the time of sentencing, the Defendant will tender to the United States District Court, District of New Mexico, 333 Lomas Blvd. NW, Suite 270, Albuquerque, New Mexico 87102, a money order or certified check payable to the order of the **United States District Court** in the amount of $200 in payment of the special penalty assessment described above.

## ENTIRETY OF AGREEMENT

50.     This document and any addenda are a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties.  This agreement is effective upon signature by the Defendant and an Assistant United States Attorney.


AGREED TO AND SIGNED this _1st_ day of _____, 2015.

16

DAMON P. MARTINEZ
United States Attorney


FRED J. FEDERICI
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico  87102
(505) 346-7274


     I have carefully discussed every part of this agreement with my client.  Further, I have fully advised my client of my client's rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.


RAY TWOHIG
Attorney for the Defendant


     This agreement has been read to me in a language I understand.  I have carefully discussed every part of this agreement with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms.  My attorney has advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.


MATTHEW DALE SAMPLE
Defendant