UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cr. No. 15-4265 |
| vs. | ) | |
| | ) | |
| MATTHEW DALE SAMPLE, | ) | |
| | ) | |
| Defendant. | ) | |

UNITED STATES' SENTENCING MEMORANDUM

Introduction

As a professional investment advisor, Defendant Matthew Sample was a sophisticated market professional with the background and experience as a financial advisor, hedge fund manager and licensed broker to give people confidence that their money was safe in his hands. Sample used his charisma, educational background, and impressive credentials as a lure to convince people to entrust him with their money.  For some, the money they turned over to Sample to invest represented their life savings, the kids' college funds, and their retirement nest eggs, accumulated over a lifetime of hard work. They had no idea that, in reality, Sample was stealing their money to fund a lavish and self-indulgent lifestyle that he could never have otherwise afforded.  Indeed, while Sample was robbing his victims of their ability to pay for their children to go to college, he was using their hard-earned money to decorate his high-end, Santa Fe mountain home –described on HGTV as the "ultimate party house!"– with outlandish

extravagances that Sample bought, such as wallpaper woven with real gold.[1]  Buying drugs can also be very expensive.

Sample now has a story for the Court to try to explain what he did to his victims.  He does not want the Court to believe that he was either selfish or ruthless, or a man who heartlessly manipulated and preyed upon those who were depending upon him to protect their family's financial safety and well-being.  Rather, he wants the Court to believe that he was a man who fell victim to the market, to other people who let him down, and to his own alleged personal struggles.  *See e.g.,* Sample letter attached to the PSR.  Yet even Sample's contention that his scheme only began "after initial losses in [his investment] strategy," Sample Plea Agreement at 3, ¶ 7, does not ring true.  It does not square with the inescapable fact that, in reality, Sample began ripping off his investors in his Lobo hedge fund almost immediately after he received his very first dollar from his very first Lobo investor, R.L.  He first convinced R.L. to entrust him to invest $50,000 of her money.  But within a matter of only 18 days, bank records prove that Sample had siphoned off all of R.L.'s investment and had spent the entire $50,000 on himself.  PSR at ¶ 29.[2]  Of course, Sample failed to disclose the material fact of how he had stolen R.L.'s

---

[1] Sample's luxurious Santa Fe home, appointed as it was when he lived there, was featured on an episode of HGTV.  A DVD featuring the "ultimate party house," which is marked as Exhibit 1, will be submitted to the Court.  With respect to Sample's luxurious lifestyle, it is worth noting that in an April 24, 2014 interview with agents after Sample acknowledged that he had diverted his investors' funds, he still insisted to agents that he had simply taken "out … money … for personal expenses."  *See* Exhibit 19 (April 24, 2014 interview excerpts) at transcript page 50.  In describing those expenses, Sample explained that he took funds that he needed "[j]ust to live … just the normal expenses that you would need to … you know, live, and I'd, you know, go on a vacation once in a while. … [Y]ou know … it's not cheap to live in Santa Fe."  *Id.* at transcript page 51.

[2] The reference to payments in paragraph 28 of the PSR that Sample made to "V. Price" as part of the diagram outlining how Sample spent the first $50,000 that R.L. gave him were some of the payments made to Price to decorate Sample's Santa Fe home, which decorations included his wallpaper woven with real gold.

money to any of his subsequent Lobo investors.  Had they known, they undoubtedly never would have trusted him with a dime of their own money.

Today, R.L. continues to suffer as a result of Sample's actions.  In her victim impact letter to the Court, R.L. describes how whenever she questioned Sample about her investments "he always had great answers and I always felt like a bad person for doubting him.  I remember crying while driving and talking to him on the phone.  He had all these excuses about … how his father was dying, why the partners he was working with were gone."  Exhibit 2 (R.L. Letter to the Court).  When R.L. finally learned that she had been the victim of a fraud, she felt "embarrassed and ashamed.  Horrified.  I cried with the SEC.  The[y] said these kind of people are so good at this that many can't see it.  Confidence men.  I still felt horrible and knew that I had lost all this money for my retirement."  *Id.*  In R.L's judgment, "Matthew is a scourge and a creep and he will NEVER learn. … He is a criminal that needs to be punished and never allowed to make money this way."  *Id.*

Sample's actions were indeed reprehensible and deserve substantial punishment.  There is no credible reason for this Court to depart or vary in any degree downward from the prescribed guideline term of imprisonment, as Sample is seeking.  Rather, the sentencing factors that this Court is required to take into account under 18 U.S.C. § 3553(a) fully support the government's recommended low-end guideline range sentence as contemplated under the plea agreement.  Plea Agreement at 12, ¶38.b.

<u>Argument</u>

A. <u>The section 3553(a) sentencing factors</u>

      1.  <u>The nature and circumstances of Sample's offense</u>

The con artist's stock-in-trade lies in gaining a person's trust or confidence and then exploiting it. A con artist is a master at quickly "reading" other people and understanding human behavior. A con artist is highly skilled in always telling a convincing story, and in making things appear to be what they are not. A con artist is talented at gaining sympathy for himself. A con artist will lie and cheat and steal without hesitation, manipulate and obfuscate the truth, and use guile and imagination to get whatever he wants, regardless of who may get hurt along the way. When questions arise, a con artist will come up with excuses, seek to delay, and try to duck full responsibility for the wreckage he has left in his wake.

Matthew Sample is a con artist.

The presentence report fairly outlines the clinical aspects of Sample's crimes, and explains how he set up his Lobo hedge fund to attract investors, whose money he then used to finance his high-end lifestyle. Of course, Sample also victimized other investors who were not part of his Lobo hedge fund, including a couple who were in their nineties, E.H and S.H. (collectively the "H's"), PSR at ¶¶ 91-92, and P.C. and his wife, N.C., *id.* at ¶¶ 19-25, who lost their life savings. The presentence report also gives a fair sense of how Sample was able to deceive his investors for at least *three years* about their money. The presentence report further provides the best estimates available about exactly how many tens or hundreds of thousands of dollars Sample was able to steal from each of his six victims.

Still, the presentence report does not fully capture the human toll that Sample mercilessly inflicted upon the people he victimized. It does not capture the real pain and horror that these

people suffered in suddenly discovering how Sample thrust them into financial peril and

radically transformed their families' fortunes and outlook for the future.  It does not capture how,

for some, plans to retire are no longer possible, or how the college funds for which the victims

sacrificed and saved for their children simply no longer exist.  Nor does it capture the deep

embarrassment and humiliation that comes from being cheated, and from discovering just how

easily and callously Sample betrayed their trust, first by stealing their money and then by

regularly lying to them and deceiving them.

G.H., on behalf of his deceased father, E.H., and his mother, S.H., has explained the

intense stress that Sample's lies and deceit had upon his elderly parents, as follows:

> To say they became distraught over it all is an understatement. My father did not
> worry about many things in his life, but I can say with certainty that the situation
> with Matt took a significant toll. He would repeatedly ask, "What is going on?
> Why doesn't he respond to me?" … We became concerned that [Sample] was
> defrauding my parents, but we did not know what we could do about it. There was
> a real sense of helplessness on all of our parts.

> In the spring of 2011 my father was hospitalized with a bleeding ulcer. While I
> realize it may be difficult to determine a real cause and effect, I am convinced that
> the stress brought on by the situation with Matt certainly contributed to his
> worsening physical condition. By the end of 2011 there was just too much anxiety
> for my parents to handle. My father was 92 years old and my mother was 90. In
> February of 2012 things came to a head when we finally convinced my parents to
> agree to formally request Matt return whatever monies still remained in their
> portion of Sample Investment Partners. Over the next several months there were a
> series of emails and a couple of phone calls to try and get Matt to return the
> remaining funds. There were many promises that he would take care of it, or that
> he was sending the money directly to their bank. But it is clear he was just
> stringing them along. He would also send me and my brother emails saying he
> would take care of it and how much he cared about my parents, but it was all a
> bunch of lies.

> My father died two years ago the day after his 95th birthday. It is a bit complicated
> to explain the whole story, but in the end he died as a result of the reaggravation
> of his bleeding ulcer. My mother is now 95 and trying to get by in their house

living off what little is left of the reverse mortgage. She sure could use the money they had entrusted to Matt Sample. It would make a huge difference in her life but we realize it is not meant to be. His offer of restitution was pathetically much too little much too late.

Exhibit 27 (victim impact letter from G.H. on behalf of the H's).

Another couple who Sample victimized, L.D. and B.D., succinctly expressed the

wreckage left by Sample's betrayal as follows:

In total we lost over 690k, we lost all of our investment.  Not only the pain and shame in realizing that we had been scammed but the monetary loss has had a significant impact on us both emotionally and mentally.  There is not a day that goes by that I don't wonder how we could have been so stupid, so blind, so trusting.  How could our friend steal from us, forever changing our life and creating so many stresses that ripple through our family to this day.  There is no savings for our kids, no College and very little help we can give as we struggle to put the pieces of our life back together.

Exhibit 9 (victim impact letter from L.D. and B.D.).

Victim N.C. has expressed her shock and horror, and the continuing damage that

Sample inflicted upon her and her husband, this way:

The horror to know all we have worked and saved for is stolen by Mr. Sample was our worse financial nightmare ever!! Learning facts of Mr. Samples deception, I felt emotionally & physically traumatized like the 9/11 disaster invoked. It's that horrific and life changing for us!  Mr. Sample has put us in a financial crisis!  I have many concerns for my husband (age 60) and I'm (age 56) we were looking forward to retirement soon but now we are forced to work harder longer for many more years ahead!  All because of Mr. Samples lies!  Knowing now how Mr. Sample mislead us to gain our trust in him and then he stole our life savings on his lavish lifestyle makes me physically ill! He's a Bernie Madoff clone and not to be trusted by any means!  What he has done to us is despicable! I'd like to point out never once in all the years working with him did he tell the truth,  Instead he made up elaborate lies and created documents to make it look like we were making moderate gains over the years.  We learned from the investigation his unethical criminal behavior went on for years! If we'd had known then what we found out now we could have had him arrested years ago! Then we could have been able to team up with an ethical financial firm to rebuild. We now suffer the lost of our retirement savings plus 10-15 years of valuable investment time

lost because of his criminal behavior!  I'd like to point out again, he never
once allowed us to know the truth and convinced us we were doing
extremely well. The truth is he's a conman caught up in unethical
behaviors and pathological lies to cover up his greed and serious criminal
behaviors stealing our precious savings!  It's sick to know every time he
met with us at our quarterly meetings & weekly phone conversations these
were all lies! He is an actor with an upbeat optimistic personality and used
his professionalism to convince us our investments were continuing with
steady moderate gains towards our retirement goal of 2 million plus.  He'd
follow up with detailed documents, letters, text messages, emails, and he
created a website for us to view our account transactions.  He convinced
us to trust him for years as it seemed we were doing well with close to a
million in our account with him.  His ability to lie face to face, on the
phone, in emails, text messages, letters and his creation of a
fake website to show us our account is absolutely insane!!  Please do not
trust him, his lawyer or his supporters!  They're manipulating the victims
once more.  The funds Mr. Sample is paying his law team should be
divided up between all the victims!  We've received a very small sum of
money from Mr. Sample in his attempt to make restitution to look better
but it's miniscule in comparison to the tremendous crime and amount he
has stolen from us!

Exhibit 22 (victim impact letter from N.C.).  Although the above excerpt is somewhat

lengthy, it still does not do justice to how much N.C. and her husband have suffered and

been forced to sacrifice and radically alter their lifestyle, which now includes endless

sleepless nights, downsizing, working from 5 a.m. to 10 p.m. each day including on

weekends, and worrying over their physical well-being.  *Id.*  They do not go on vacation

anymore because they can no longer afford it.  *Id.*  Sample stole that from them.  N.C.'s

husband, P.C., has written a similar victim impact letter, which is attached hereto as

Exhibit 23.

By contrast to his victims, shortly before he pled guilty in this case, Sample was

able to enjoy going on a cruise with his mother and fiancé to celebrate his mother's

recovery from cancer.  *See* Transcript of Sample's December 1, 2015 plea hearing at 23.

The images that Sample posted of himself on his Facebook page while he was busy

stealing his investors' money also showed a young man clearly "living it up" at ballparks, arenas, bars and at the beach. See Exhibit 24 (images from Sample's Facebook page). Notably, even now, Sample has not chosen to live in a nondescript or boring city in middle America, but rather in the seaside city of San Diego, California, which is one of the most highly desirable but expensive cities in the country in which to live.

When a licensed broker and professional investment advisor like Sample exploits his knowledge and position for personal gain it also does incalculable damage to the financial system. In order for the market to function properly, the investing public has to have confidence in the institutions and licensed professionals who are part of the system. If the public loses trust in the integrity of its licensed professionals, then the markets and the system will simply not function the way that they should. Thus, in addition to all the personal pain that Sample visited upon individuals whom he betrayed, Sample should be held to full account for the real damage that he inflicted upon the system as a whole.

2.   The history and characteristics of the defendant

Sample's basic greed, selfishness, callousness and dishonesty are obviously revealed by the nature and scope of the crimes he committed. However, after his crimes were discovered, Sample's efforts at trying to manipulate his victims to enlist them, both before the Securities and Exchange Commission (SEC) and this Court, to help him avoid a prison term speak both to his insincerity and his consistent focus upon himself. Moreover, his recent efforts at disavowing the victim status of the H's, PSR at ¶¶ 55 and 73-75, demonstrate his lack of complete acceptance of responsibility for his crimes. Finally, Sample's contention in his plea agreement that he did not set up a bogus website for the purpose of deceiving his victim, P.C., Plea Agreement at ¶ 29, is

further belied by the facts and only serves to cast even more doubt upon Sample's credibility before this Court.

      a.   <u>Sample's misleading statements and attempts to further manipulate his victims and the SEC in order to avoid prison</u>

In April 2014, as part of a civil action that the SEC brought against Sample in federal court for defrauding the Lobo investors, a bar was imposed against Sample which prohibited him from, among other things, associating with any broker, dealer or investment advisor.

In September 2014, Sample began to contact his victims, including the H's, seeking to enlist their support with the SEC to have the bar lifted. On December 16, 2014, Sample wrote to the SEC requesting the SEC to lift the bar.  Exhibit 3 (Sample's December 16, 2014 letter to the SEC).  In his letter, Sample immediately sought to align his interests with those of his victims by contending that if the bar was not lifted "the investors would be severely and adversely affected and their protection is the primary concern." *Id.*  Sample claimed that the investors "know the Commission's approval of my request is the *only legitimate chance for recovery*." *Id.* (Emphasis added.)

As part of his campaign for lenient treatment, Sample wrote to his victims and informed them that the "alternative is stark, if I cannot get reinstated, I will be prosecuted by the US Attorney in Albuquerque, will go to jail, and will when I am released, as a convicted felon, have little or no earning power ever to make restitution."  Exhibit 4 (Sample's September 2014 letter to the H's).  Sample implored each of his victims, including the H's, to sign a form letter he had written for the victims to send to the SEC, in which he asked his victims to state: "[W]e strongly support his request as it is the only way we will ever see restitution.  If the SEC does not approve his request and he is prosecuted, our lives and future retirement will be adversely affected.

Matthew has expressed remorse for his actions and has a plan ready to go into action that will allow us to be made whole." *Id.*

In fact, Sample's "ready to go into action" plan for allegedly making the victims whole was never feasible or realistic,[3] which meant that his September 2014 letter to the victims boiled down to little more than another effort to manipulate them and prey on their emotions so that he could further his real agenda of trying to stay out of prison. To that end, the central premise of his letter to his victims that if he could not get reinstated he would be prosecuted was misleading. Sample's statement clearly, yet falsely, implied that if he did get reinstated, then the USAO would not seek to prosecute him. But the idea that the USAO might be willing to forgo prosecution was not true and Sample knew it.  By the time Sample wrote his September 2014 letter to his victims, the USAO had unequivocally informed Sample, through his then-attorney, Ed Tomko, both on the telephone and also in writing on May 1, 2014, May 19, 2014 and May 23, 2014, that the USAO disapproved of Sample's proposal to the SEC and that Sample was going to be prosecuted, period.  For that reason, on October 2, 2014, after the USAO became aware of Sample's letter to the victims, the government warned Tomko about the misleading representation Sample had made to the victims by suggesting to them that the USAO might not prosecute him.

Shortly after the government's message to Tomko, Sample had an October 3, 2014 email exchange with G.H., one of the H's sons, imploring G.H. to advocate on Sample's behalf with

---

[3] Not surprisingly, the actual terms of Sample's proposal were somewhat murky, and seemed to change depending upon the day he described it.  On June 2, 2014, for example, Sample represented to the SEC that he was prepared "immediately to make full restitution" through another individual, C.D.. Exhibit 13 (excerpt from Sample's June 2, 2014 affidavit to the SEC) at ¶ 26(b).  Yet the SEC later described Sample's proposal as one in which C.D. was only willing to lend Sample a small fraction of the money he owed to the victims on loan terms that were uncertain.  Exhibit 5 (excerpt from SEC's February 4, 2015, Denial of Sample's Rule 193 Application) at 11-12, nt. 43.

the SEC because the USAO wanted "to move forward with a plea or an indictment."  Exhibit 6

(October 3, 2014 email exchange).  For that reason, Sample sought to pressure the H's into

signing a letter to the SEC by the close of business that same day, stating that "we believe with

our four largest investors on board our chances for success are greater. Our only hope is that the

SEC does vote to reinstate quickly … and then we would ask the US Attorney for a … non

prosecution agreement." *Id.*  Sample then admitted knowing that "[t]hey have not been receptive

to our proposal so far," *id.,* though he obviously knew that the USAO's position was far more

resolute than that.

      Notwithstanding the above, in his December 2014 letter to the SEC, Sample again sought

to mislead, by effectively reasserting to the SEC his earlier misleading statement to his victims

that "*[i]f not allowed to re-associate*, the U.S. Attorney in Albuquerque will in all likely-hood

indict or force a plea for incarceration and the post incarceration earning potential would be

severely limited." Exhibit 3 (emphasis added).  Again, the USAO never had any such a

contingency with respect to prosecuting Sample, and Sample knew it.  In denying Sample's

request to be permitted to associate with a registered investment advisor, however, the SEC

rightfully brushed aside Sample's suggestion that he might not be prosecuted if the SEC lifted its

bar, noting that Sample's representation was "without elaboration or support."  Exhibit 5

(excerpt from SEC's February 4, 2015, Denial of Sample's Rule 193 Application) at 4, nt. 12.

      Notably, the SEC was also underwhelmed by Sample's efforts to recruit his victims to

support his application to lift the SEC bar.  Indeed, the SEC noted that only two of Sample's

victims had submitted letters in support of the application, and then only because Sample had

managed to convince them that Sample's scheme appeared to be their only hope of recovering

any of the funds he had stolen.  Exhibit 5 at 12.  For example, the SEC quoted one of Sample's

victims, M.R., *see* PSR at ¶¶ 30-33, as saying that the loss that Sample had inflicted upon him "is extremely painful both financially and emotionally.  I am angry at Mr. Sample and emotionally drained by the events surrounding the Lobo fund … However, despite the loss and my feelings toward Mr. Sample, I support his request because it would appear this is the only possible way of receiving my money."  Exhibit 5 at 12, n. 46.  A copy of the victim letter that M.R. wrote to the SEC is attached hereto as Exhibit 7.

b.  <u>Sample's ongoing conduct toward his victims</u>

Even though, as outlined above, Sample had represented to the SEC (and his six victims) that the "only" chance he realistically had to repay the victims was if the bar the SEC had was lifted, and even though the SEC rightfully refused to lift the bar, Sample never ceased trying to convince his victims to join him in his efforts to avoid prison based on the false promise that, if he stays out of prison, he will still somehow manage to come up with the money to repay them. It is obviously emotionally exhausting for those who have had their life savings stolen to have their emotions endlessly played upon. Yet despite the fact that he has no realistic means of repaying his victims, that has not restrained Sample from continuously holding out false hope to them, including in the form of a handful of restitution checks, apparently financed in part from his mother. Trafficking in false hope serves Sample's interest, of course, because he really only needs to maintain the illusion through the time of his sentencing, when he most needs his victims to voice their support for keeping him out of prison.

Naturally, the government always wants defendants to pay restitution to their victims, regardless of a defendant's motives for doing so.  Stolen money is money that belongs to the victims which should be returned to them without any strings –emotional or otherwise– attached. In this case, however, the self-serving manner in which Sample has consistently sought to tie any

future restitution payments to having his victims advocate for lenient treatment simply should not be overlooked.

For example, on August 4, 2015, Sample's attorney wrote a letter to each of the victims of Sample's fraud. The letters were worded identically. One of those letters, which is attached hereto, was addressed to the H's.  Exhibit 8 (August 4, 2015 letter to the H's from attorney Twohig).  (E.H. and S.H. had entrusted their money to Sample when they were quite old.  E.H. died at age 95 in October 2014.  S.H., who is still living, is also in her 90's.)

In his August 4, 2015 letter to the H's, Sample's attorney introduced himself to them and wrote that Sample wished "to make restitution to you for the loss you suffered as a result of his actions." *Id.* Sample also enclosed a small check, stating that the funds represented "a relative proportion of the funds available from Ms. Sample [Matthew Sample's mother] and Mr. Cullen Davis [a long-time friend or associate of Sample's] for that purpose." *Id.* Sample's attorney also indicated that Sample was "hopeful that he will be able to make additional payments in the event that he is able to continue working."  *Id.*  The timing of Sample's warning to his victims that he might not be to make any additional restitution payments after this first payment from his attorney was significant insofar as it was made while Sample was engaged in plea negotiations with the United States – a fact that Sample also made a point of sharing with his six victims in subsequent letters that contained restitution checks.

For example, in one of the set of letters he sent to the victims dated November 16, 2015, Sample sent the H's another "check for partial restitution" of $175.80.  Exhibit 10 (November 16, 2015 letter from attorney Twohig).  In that letter, Sample's attorney informed the H's that he was "still negotiating with Mr. Federici … in an effort to resolve the issues involving alleged criminal conduct in such a way as to permit continued restitution from his current employment

income." *Id.* One view of Sample's strategy thus appeared calculated at dangling money in the hope that the six victims might pressure the government to cut Sample a plea deal on terms that would assure that Sample would avoid a prison sentence, however much Sample might otherwise deserve to go to prison.

Sample's November 16, 2015 letter was also notable insofar as he further alerted the victims that even though he had filed a bankruptcy petition, he was not seeking to discharge his obligations to them, but instead intended "to make restitution in an amount based on his current income if he is able to do so after reaching agreement with Mr. Federici." *Id.* In addition, Sample informed his six victims that the checks he was sending with his letter were less than he had sent before, because Sample had used some of the funds that would have otherwise been available for restitution "to obtain expert analysis of the transactions in issue." *Id.* In other words, even though he did not tell his six victims as much, Sample spent money that he otherwise could have used to help repay his victims to hire the experts who wrote the report upon which he is now relying to try to minimize the amount of money that he owes to his victims. Indeed, it is those very experts whom he paid that Sample is now relying upon to try to deny the H's victim status altogether. *See e.g.,* Sample's July 6, 2016 Objections to the PSR, at 4-5.

On December 1, 2015, Sample pled guilty to charges of mail and wire fraud.

On January 26, 2016, Sample's attorney wrote another round of letters to Sample's victims with another small check to each of them. Exhibit 11 (January 26, 2016, letter from attorney Twohig). In that round of letters, Sample stated that he had "reported his plea agreement to his employer and he continues to be employed." *Id.* at 1. Sample also emphasized that "if the sentence requires incarceration that will end his current employment, and so will end his ability to pay restitution, at least during the period of incarceration and likely will

dramatically reduce it thereafter." *Id.* Sample then directly solicited the victims to "consider the possibility of including a request in any letter to the judge for a non-incarceration sentence in order to maximize restitution payments to you and other victims." *Id.* Sample next told the victims that the employment he "has obtained *continues to provide the means for substantial restitution*." *Id.* (Emphasis added). He then stated that he "hope[d] you will join me in asking that he be allowed to keep that job and make those payments." *Id.* at 3. In that same January 26, 2016 letter, since Sample was barred by the Court from contacting the victims, Sample's attorney included a direct appeal to the victims from Sample himself, in which Sample asked the victims to "urge the court to impose a non-incarceration sentence … so that I can keep my job … and fully make amends to you and your families … monetarily." *Id.* at 2.

Yet if the sworn representations that Sample made on his petition for bankruptcy are to be believed, by January 2016 his net income had dropped to a dismissal state, a material fact which Sample failed to share in his letters to his victims. According to his bankruptcy petition, which he filed on November 24, 2015, for the six months prior to his filing he was employed at a sales job in which he received a gross income of only $4,853 a month. Exhibit 12 (excerpt from Sample's November 2015 bankruptcy petition) at 8. Sample further represented that he did not expect an increase in his income within the year after filing his petition. *Id.* at 9. In addition, after permissible expenses, Sample stated that he had only $65 of net monthly income available to split among all of his creditors. *Id.* at 10. This was material information about which Sample chose to say nothing in his ongoing efforts to try to persuade his victims to argue for lenient treatment on his behalf. In other words, based on his own sworn declarations in his November 24, 2015 bankruptcy petition, Sample's claim in his January 26, 2016 letter to his victims that the

employment he "has obtained continues to provide the means for substantial restitution," Exhibit 11 at 3, appears simply not to have been true.[4]

  c. <u>Sample's attempt to claim that the H's were never victims and that he only paid them because he felt badly for them</u>

   Sample's recent claims that the H's were never victims of his crimes also lack credibility. His sudden "about face" further contradicts the promise he made as part of his plea agreement, and it is certainly not consistent with full acceptance of responsibility.

   In his first set of objections filed on March 23, 2016, Sample for the first time challenged the description of E.H. in the presentence report as being a victim of fraud. Sample's March 23, 2016 Objections to the PSR at 3.  Sample claims that he "did not misappropriate any of [E.H.'s or the H's] funds. … It should be noted that he has been treated as an investor who suffered losses, and has been receiving restitution payments from Mr. Sample through undersigned counsel, as have the other investors, though he is owed no restitution." *Id.*  Sample's attorney further contends that "all of this has been explained … to Mr. Federici in my letter dated August 27, 2015." *Id.* Sample further represents to the Court that "[a]fter their funds were lost in investments, because Mr. Sample felt badly about the [H's] losses, he paid a total of $59,000 to them, which was not owed, from his own funds." *Id.*

   The government has reviewed Sample's attorney's lengthy letter to the government dated August 27, 2015.  Nowhere within that letter, which predates the plea agreement, does Sample's attorney ever claim or suggest that the H's were not victims of fraud.  Rather, the letter simply

---

[4] It may also be of interest to the Court that, in the February 14, 2016 letter that Sample submitted to the Court from C.D., C.D. indicates that that he loaned Sample $5,000 in the summer of 2015 for Sample to use to repay his defrauded investors.  *See* C.D. letter at 2.  C.D. also states that Sample has been paying C.D. "back monthly $500 out of his income and has nearly paid off the balance." *Id.*  However, if Sample was required to disclose those monthly payments or that unsecured debt on his November 24, 2015 bankruptcy petition, he does not appear to have done so.

outlines various unrelated arguments that Sample was making at the time.  It then identified the H's, L.D. and B.D., and P.C. and N.C., as among the persons to whom he had been making "investor repayments" for which Sample wanted to receive sentencing credit.

In his second set of objections to the PSR dated July 6, 2016, Sample repeats his claim "that the [H's] were not victims of criminal conduct." Sample's July 6, 2016 Objections to the PSR at 2.  *See also* PSR at ¶¶ 55 and 56 (defendant's version of the offense).  He contends that even though he made restitution payments to the H's as victims on a regular basis, "he did not view them as victims of the offenses, they were investors and he and counsel realized that they could erroneously be viewed as victims in this case, as they were in the first PSR.  *In addition, the restitution obligation in the plea agreement could be interpreted to apply to them." Id.* (emphasis added). Sample goes on to claim that "[n]ow that the probation office has acknowledged, based on the FBI analyst's concession, that they are not victims, Defendant will stop making restitution to them unless otherwise ordered by the Court." *Id.* (citing paragraph 64 of the PSR which was re-disclosed on May 9, 2016).  Sample's counsel then repeats his claim that "the [H's] are not victims [was] earlier made to Mr. Federici during plea negotiations, but there was no resolution of the issue until now." *Id.*

Regardless of how much restitution the Court is able to determine that the H's ultimately may be due as a consequence of gaps in the documentary record, Sample's opportunistic denials about whether the H's should be considered victims of his fraudulent behavior are not believable for a multitude reasons.

First, the plea agreement specifically included the H's as victims who were entitled to restitution in paragraph 38.a. because that is the status that the H's were understood to have at the time the agreement was signed.  Sample now seeks to acknowledge only that "the restitution

obligation in the plea agreement *could be* interpreted to apply to them." Sample's July 6, 2016 Objections to the PSR at 2 (emphasis added).  Of course that provision of the plea agreement *could be* interpreted to apply to the H's, because it was *explicitly intended* to apply to them.  The plea agreement thus reads in pertinent part as follows:

> The Defendant acknowledges that his scheme to defraud investors extended beyond the investors identified in the two counts of conviction and should include full restitution to all of the victims identified in submissions the Defendant has previously made to the Securities and Exchange Commission, including in the Defendant's affidavit to the SEC that is dated June 2, 2014.

Plea Agreement at 11, ¶ 38.a.

As revealed in paragraph 16 of Exhibit 13, which is an excerpt from the June 2, 2014 affidavit that Sample submitted to the SEC referenced above, Sample clearly identifies the H's as being entitled to repayment from him by listing them without exception as being among the other five victims he has elsewhere admitted defrauding.  Including the H's made a total of six victims that Sample explicitly acknowledged actually harming in submissions to the SEC.  For example, in a July 31, 2014 letter to the SEC, Sample again referred to "6 injured investors."  Exhibit 14 at 2.  Likewise, in another affidavit that Sample submitted to the SEC in his effort to have the bar against him lifted, he referred to "the six harmed investors."  Exhibit 15 at 3 ¶ 6.  Yet somehow despite his repeated, earlier admissions, Sample now represents the complete opposite to this Court, and "object[s] to the assertion there were six victims, where there are actually five." Sample's July 6, 2016 Objections to the PSR at 4.

In paragraph 43 of the plea agreement, explicit reference was again made to Sample's June 2, 2014 SEC affidavit by noting that the "Defendant began making partial restitution payments to victims identified in paragraph 16 of Defendant's affidavit to the Securities and Exchange Commission dated June 2, 2014, in July/August 2015." Plea Agreement at 14, ¶ 43.

The affidavit was referenced a final time in paragraph 45 of the plea agreement, when the United States agreed that "with respect to those victims who Defendant previously identified in his July 2, 2014 affidavit to the SEC who have not also not been described within the present information, the United States will not bring additional charges against Defendant arising out of the facts forming the basis for the Court's final restitution order." Plea Agreement at 15, ¶ 45. Nowhere in the plea agreement or in his June 2, 2014 affidavit for the SEC did Sample ever identify the H's as standing on any different footing than any of his other five admitted victims. Nor, as far as the government is aware, has Sample ever previously represented to anyone that the only reason he ever paid the H's was out of the kindness of his heart or because he simply felt sorry for the H's after they lost their money in the market. In light of the heartlessness Sample has demonstrated toward others, his story of unalloyed altruism simply does not ring true.

Sample's claim also stands in stark contrast with other available evidence. For example, the government is not aware of any record of Sample having ever informed the H's that even though they had lost all their money in the market, he had decided to repay them "from his own funds," Sample's March 23, 2016, Objections at 3, and that he was doing so purely out of altruism.

In fact, it is not even true that Sample only used money "from his own funds" to pay the H's. Rather, in accord with paragraph 92 of the PSR, the FBI traced a significant amount of the money that Sample paid to the H's as coming from funds that Sample simply stole from other victims.[5] Pure altruism surely fails to explain this.

---

[5] The PSR suggests that the entire amount of money that Sample paid to the H's was funded from other victims. PSR at ¶ 92. It is more accurate to say that the FBI was able to trace a significant percentage of the money that Sample paid to the H's as coming from other victims.

Sample's narrative of his claimed saintly benevolence toward the H's is further belied by his interactions with the H's, including their sons, F.H and G.H..  Those interactions apparently started to become more contentious after the H's began suspecting that Sample was defrauding E.H. and S.H..  On February 29, 2012, for example, F.H. asked Sample why it was taking so long to send a check, stating that Sample's "stalling, broken promises and delay tactics appear frankly embarrassingly transparent."  Exhibit 16 (February 29, 2012 email from F.H. to Sample).  F.H. further stated: "We are also awaiting a K-1 from you for 2011 … and any year end information re your current investments, targets for the coming year, etc. … Everything about this appears homemade and fraudulent to me.  I hope you can prove to me otherwise."  *Id.*  In another email, dated June 22, 2012, F.H. asked a series of basic questions that Sample had apparently never answered and then remarked that Sample had been "playing a shell game" that had "been taking a big toll" on his elderly parents and that having "put their life savings in [Sample's] hands" they had been reduced to "fighting to get through their financial obligations month to month." Exhibit 17 (June 22, 2012 email from F.H. to Sample).  On September 29, 2012, E.H., F.H.'s father, wrote to Sample asking where his wife's money was.  E.H. ended his email by telling Sample that "[t]he boys have had enough of this they are talking to the FBI in California." Exhibit 18 (September 29, 2012 email from E.H. to Sample).

Obviously, Sample's receipt of any of the above exchanges would have been an opportune time for him to have disclosed his alleged altruism.  It also would have been an opportune time for him to have produced records to show how the H's money had all been legitimately invested and lost in the market.  But, of course, Sample never did that.  Nor has he done so since.

Instead, Sample treated the H's the same way that he treated his other victims, by first sending them fictitious financial statements.  In a taped interview that FBI agents conducted with Sample on April 24, 2014, Sample admitted that he had sent falsified financial statements to the H's.  Exhibit 19 (transcript excerpt from April 24, 2014 interview of Sample) at transcript page 47.  Sample had no reason to have sent the H's false financial statements if he had not misappropriated their money.

In that same April 24, 2014 interview with the FBI, the agents basically acknowledged to Sample and his attorney that they did not have the same sort of documentation available for tracing what Sample had done with the H's money as the FBI had for his other victims.  Exhibit 19 at transcript pages 130-31.  This lack of documentation was because the H's were not investors in the Lobo Fund, like all but one of the other five victims.  The Lobo fund was the fund which the FBI was investigating, so the FBI essentially had no paper trail for what Sample had done with the H's money.  In any event, in response to the agents' question about where the H's money had gone, Sample claimed that he really could not remember, but he was insistent on one point: "[Y]ou know, they're owed that money.  There's, there's no question."  Exhibit 19 at transcript page 131.  Of course, Sample would not have "owed" any money to the H's if he had not misappropriated it.

Furthermore, in the June 2, 2014 affidavit that Sample voluntarily provided to the SEC, he specifically listed the H's as being among the people who he wanted to be "paid back," Exhibit 13 at ¶ 16, without distinguishing them in any way from any of the other five names on his list, all of whom Sample still acknowledges are victims of his crimes.  Sample's new contention that he did not misappropriate any of the H's money is also belied by his efforts in October 2014 to recruit the H's to advocate for the SEC to lift the ban against him.  As outlined

21

in Exhibit 6 above, if Sample did not owe the H's any money and did not consider them to be victims of his crimes, then there would have been no reason for him to have tried so hard to recruit G.H. to support his efforts to have the SEC bar lifted, as the family representative of what Sample described as one of his "four largest investors."

Sample's contention that he that he never paid the H's any restitution that he owed to them, but only provided them with money in his heretofore secret role as their silent benefactor, is further belied by the restitution Sample started paying to his victims as part of his campaign to convince them to advocate for leniency in connection with his pending criminal charges. Indeed, as outlined above, in his letters that Sample sent to the H's which accompanied the checks he sent them, Sample referred to the H's as "victims," and consistently described the money he was paying to them as "restitution," *see e.g.,* Exhibit 11 (Sample's January 26, 2016, letter to the H's in which he solicited them to "consider the possibility of including a request in any letter to the judge for a non-incarceration sentence in order to maximize restitution payments to you and other victims") at 1.

Finally, Sample listed the H's as his legal creditors in his bankruptcy petition.  As his bankruptcy attorney explained to the H's, Sample did so because "[b]y bankruptcy law, Mr. Sample was required to list all persons as creditors to whom he believed he owed money." Exhibit 20 (January 27, 2016 letter from Sample's bankruptcy attorney to the H's).  Here again, if the H's money had simply been lost in the market as Sample now wants this Court to believe, then Sample obviously never would have "owed" them any money.  Instead, Sample officially recognized the H's as having the legal status of being creditors in his bankruptcy action.

In sum, Sample's sudden epiphany that he never defrauded the H's is not credible.  All of the available evidence surrounding Sample's conduct until the time he signed the plea agreement

proves by far more than a preponderance of the evidence that Sample is not telling this Court the truth, and that he misappropriated money that the H's entrusted them to invest on their behalf, just as he misappropriated the Lobo fund investors' money.  Of course, it is a more sympathetic and easier defense narrative to sell at sentencing if the defendant's fraud practices were centered upon a single hedge fund that can be characterized as faring poorly in the market, rather than being different variations of the same scheme separated by space, time and multiple sets of victims.  That said, it is admittedly more difficult to ascertain precisely how much money the H's are owed in restitution than Sample's other victims because of deficiencies in the financial paper trail, but that does not mean the H's were never victims.  Sample signed a plea agreement in which he agreed that the H's should be treated like all his other victims.  That he now thinks it is in his interest to disavow his promise only serves to show that he has not changed, that he is not being sincere or truthful with this Court, and that he is not truly remorseful.

    d.   <u>The bogus "BSI" website that Sample set up to deceive victim "P.C."</u>

As part of his offense conduct, Sample set up a sham website, "www.bsicap.com," as a vehicle for deceiving victim P.C..  PSR at ¶ 24.  Sample directed P.C. to the website as a way for P.C. to allegedly monitor his investment account, which Sample had led P.C. to believe was with a company called BSI.  In reality, the spreadsheets that Sample posted about P.C.'s money on the bogus "www.bsicap.com" website that Sample set up were false.

In his plea agreement, Sample admits that he posted false updates about P.C.'s investments on the website.  However, he also claims that the "website … had been registered with [his] knowledge for another purpose."  Plea Agreement at ¶ 29.  As part of his version of events in the PSR, Sample elaborated that his "information was used, with his consent, to register the website" by an individual he identified as A.F., PSR at ¶ 54, a person Sample now accuses of

being part of another fraud scheme in which Sample allegedly stands on the side of the victims. The PSR further states that Sample was allegedly given a "login [for the "www.bsicap.com" website] to be able to track … an unrelated investment he helped to manage" for C.D.  *Id.*

Though the distinction between whether Sample set up the bogus website for the purpose of furthering his fraud scheme against P.C., or whether someone else set it up "for another purpose" and Sample then chose to employ it in his scheme against P.C., admittedly has no legal significance, the issue is still significant with respect to Sample's candor to this Court.  Sample's version of events minimizes the planning and deceit that he undertook in targeting and lulling P.C. as part of his fraud scheme.  This minimizing is significant in part because Sample actually set up the bogus site in November 2012, months after attorneys for L.D. and B.D. had sent him a demand letter threatening to file a lawsuit for fraud, thereby threatening to unravel Sample's scheme.  Indeed, by January 2013, the SEC had opened an investigation, and by April 2013, Sample and his attorney, Ed Tomko, had an interview with the SEC in which Sample confessed that he had been engaged in fraud, but Sample said nothing about the "www.bsicap.com" site. For months afterward, Sample then continued to post false statements on the bogus "www.bsicap.com" site in order to conceal from P.C. that P.C.'s money was gone.

In fact, documents that the FBI obtained from "1&1 Internet, Inc.," which is the company where the bogus BSI website was established, show that it was Sample, not someone else, who set up and paid for the bogus website on November 14, 2012, using his credit card.  If one visits the "1&1" site on the web today, it is a company that advertises itself as being able to help even inexperienced customers set up a website and domain,[6] which makes perfect sense for Sample to

---

[6] *See* Exhibit 25 (1&1's site on the internet which advertises: "Set Yourself Apart, Create Your Own Website! No experience necessary … Domain included,"), attached hereto.

have done as part of a fraud scheme.  All of the bills for the website were subsequently sent to Sample at his home address.  A copy of the "1&1 Internet, Inc." documents are attached hereto as Exhibit 21.  Those documents also reveal that very soon after the bogus site was set up, on November 19, 2012, Sample contacted customer service seeking help "to download an excel spreadsheet to his website."  *Id.* at 8-9.  If Sample was simply supposed to have been logging onto the website to "track" C.D.'s investment, as Sample now claims, there would have been no need for him to post any spreadsheets on the website.  Getting help on how to post spreadsheets was undoubtedly for the purpose of knowing how to post false documents for P.C. to view. Hence, the version of events that Sample has shared with this Court once again does not appear to withstand scrutiny.[7]

3.   <u>The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law and provide for just punishment</u>

Justice demands that Sample be sentenced to a significant term of imprisonment commensurate with the very serious crimes that he committed, as reflected both by the lasting emotional and financial devastation that he wrought upon his victims, as well as the general distrust such crimes engender for financial professionals and the financial system.  When Sample's six victims went to him as a financial professional to help them navigate the complexities of the markets, they believed they were doing the responsible and prudent thing to

---

[7] It is also noteworthy that, in a July 31, 2013 email to Ed Tomko, the attorney who was then representing Sample before the SEC, Sample described fraud that he claimed was occurring at BSI.  Exhibit 26 (July 31, 2013 email to Ed Tomko).  At the time Sample obviously knew that he was under scrutiny, and he requested Tomko to report his suspicions about BSI to the SEC and the FBI.  Sample's email included describing how the contact website for BSI, which was at the domain "bsicglobal.com," had been taken down.  Logically, it seems that the "bsicglobal.com" domain would have been the domain where Sample presumably would have expected "track" C.D.'s investments if Sample truly wanted to do so, not "www.bsicap.com."  In any event, Sample never mentioned the bogus www.bsicap.com site in his email to Tomko.

assure their family's future, financial security and well-being.  Yet understanding that Sample

still betrayed them, as well as the profession for which he was trained.  For these reasons,

anything less than a guideline sentence for Sample would be an injustice and only serve as a

further betrayal of his victims.[8]

### 4.   The need for the sentence imposed to afford adequate deterrence

The appellate courts have repeatedly affirmed the importance of general deterrence in

determining a sentence, especially in the area of white-collar crime.  The Tenth Circuit has called

it a "crucial factor" in sentencing decisions for economic crime, noting that the Senate Report for

the Comprehensive Crime Control Act of 1983 deemed deterrence to be "particularly important

in the area of white collar crime."  *United States v. Morgan*, 635 Fed. App'x 423, 450 (10th Cir.

2015) (unpublished) (quoting S.Rep. No. 98–225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N.

3182, 3259); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (recognizing that

deterring white-collar crime is "of central concern to Congress").  Indeed, economic crimes are

"prime candidate[s] for general deterrence," being "more rational, cool, and calculated than

sudden crimes of passion or opportunity."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th

Cir. 2006) (quoting Stephanos Bibas, *White–Collar Plea Bargaining and Sentencing After

Booker*, 47 Wm. & Mary L.Rev. 721, 724 (2005)); *United States v. Hayes*, 762 F.3d 1300, 1308

(11th Cir. 2014) ("[G]eneral deterrence is an important factor in white-collar cases, where the

motivation is greed.").

---

[8] The government believes that it goes without saying that Sample's proposal that he should be sentenced to a probationary sentence would be a travesty, and that the idea should not be given serious consideration.  Such a sentence would effectively communicate "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).  Indeed, a probationary sentence would be one that sends the message: "Crime pays."

There can be no serious dispute about the importance of seeking to deter other individuals from stealing from their clients, especially those who may currently be in the same sort of position of fiduciary trust with members of the investing public that Sample once held.  Financial professionals should harbor no doubt that if they dare to commit the type of abuse and crimes that Sample carried out, the result will be certain and severe, as demonstrated by the sentence that Sample should receive.

     5.   <u>The need for the sentence imposed to protect the public from further crimes of the defendant</u>

In terms of specific deterrence, there can also be no doubt that because of his base dishonesty, selfishness, greed, intelligence, and ability to persuade others to trust him, Sample will always present a substantial risk of recidivism, especially if he feels desperate.  The fact that Sample is no longer a licensed broker or an investment advisor is of no moment, as fraud is a crime that is limited only by one's imagination, and it can occur wherever there is money or people are present.  A guideline sentence would best assure that Sample will be adequately deterred from committing any future crimes.

     6.   <u>The sentencing range for Sample's offense under the sentencing guidelines</u>

Under 18 U.S.C. § 3553(a)(4), in determining Sample's sentence, this Court must consider the guidelines sentencing range for his offense.  In this case, the PSR indicates that Sample's sentencing guideline range is 78 to 97 months of imprisonment.  PSR at ¶143.  As the Tenth Circuit has explained, "the Guidelines are an expression of Congress's intentions in passing the sentencing laws."  *United States v. Hildreth*, 485 F.3d 1120, 1128 (10th Cir. 2007) (quotation marks omitted).

In *Rita v. United States*, 551 U.S 338 (2007), the Supreme Court held that the courts of appeals may apply a presumption of reasonableness to any sentence that is within a properly

calculated guideline range.  The Supreme Court explained that such a presumption is warranted by the fact "that the sentencing statutes[9] envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic [18 U.S.C.] § 3553(a) objectives, the one at retail, the other at wholesale."  *Rita*, 551 U.S. at 348.  Through the Sentencing Commission's work, the guidelines therefore already "seek to embody the § 3553(a) considerations, both in principle and in practice[,]" so "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Id.* at 350.[10]  In other words, "a properly calculated Guidelines sentence will typically reflect an accurate application of the factors listed in § 3553(a)."  *Hildreth*, 485 F.3d at 1128 (quotation marks omitted).  Here, there is no reason to doubt that is the case, and the government's recommended sentence of imprisonment at the low end of Sample's guideline sentencing range would be both a fair and appropriate sentence for what he did.

       7.   <u>The need to avoid unwarranted sentencing disparities between defendants who have committed similar crimes</u>

The preamble of the Declaration of Independence declares the "self-evident" truth that "all men are created equal," which has aptly been described as the "creed" of what it means to be an American citizen.  These five simple words enshrine our foundational ideal: that our Republic was founded as a nation of laws and not of men.

---

[9] *See* 28 U.S.C. §§ 994 and 994(m) and 18 U.S.C. § 3553(a).

[10] *See also Booker*, 543 U.S. at 264 ("[T]he Sentencing Commission remains in place, writing Guidelines, collecting information about actual district court sentencing decisions, undertaking research, and revising the Guidelines accordingly."); *Gall v. United States*, 552 U.S. 38, 46 (2007) ("[E]ven though the guidelines are advisory rather than mandatory, they are, as we pointed out in *Rita*, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.").

The animating principle of the sentencing guidelines –that, absent extraordinary circumstances, similarly-situated defendants should suffer similar consequences for their crimes– is basically a real-world application of our founding creed.  And a key insight of the guidelines is that they are essential because their opposite –which is any purely indeterminate sentencing scheme courts have ever tried– has never worked to consistently produce outcomes reflecting similar consequences for similarly-situated defendants.  Indeterminate sentencing schemes don't work because however wise, well-intentioned or intelligent individual judges may be, without guidelines, there is inevitably no way of assuring that one judge's sentencing decisions will bear any relation to what a judge in the very next courtroom may think is fair or just in the very same case.[11]  By developing the guidelines to "reduce unjustified disparities," Congress therefore aspired to "reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice."  *Koon v. United States*.  518 U.S. 81, 113 (1996).

A sentence within the guideline range is the best approach to prevent unwarranted sentencing disparities between similarly-situated defendants.  "[T]he purpose of the Guidelines is to promote uniformity in sentencing so as to prevent vastly divergent sentences for offenders with similar criminal histories and offenses."  *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006) (alteration omitted).  Even after *United States v. Booker*, 543 U.S. 220 (2005), "[t]he Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the

---

[11] It was this situation that caused Justice Stephen Breyer to decry such indeterminate sentencing systems as being completely unmoored:

> The length of time a person spent in prison appeared to depend on "what the judge ate for breakfast" on the day of sentencing, on which judge you got, or on other factors that should not have made a difference to the length of the sentence.

*Blakely v. Washington,* 542 U.S. 296, 332 (2004) (Breyer, J. dissenting) (internal citation omitted).

country." *Id.* So surely the message for victims of white collar crimes in New Mexico should be that their pain and suffering counts just as much as the pain and suffering of any similarly-situated victims in any other district where the guidelines are applied with full force. If for no other reason than to uphold that most basic principle, Sample should be sentenced to the low-end guideline sentence contemplated by the government in the plea agreement. Plea Agreement at 12, ¶38.b.

### 8.   The need to provide restitution to the crime victims

As discussed at length above, only after Sample realized that his prosecution was unavoidable did he decide to launch a desperate campaign among his six victims to try to convince them to actively support his efforts for lenient treatment. Prior to that, he did not pay most of them a penny, even when he was employed. But he apparently did find at least some money to pay the lawyer who represented him before the SEC, his bankruptcy attorney, his current lawyer, and the defense experts who prepared their report in this case. He has now paid a fraction of the restitution owed to his victims, apparently financed in part with money from his mother. The irony of convincing the very people whom he hurt so badly to advocate for a probationary sentence is rich, and is perhaps the pinnacle of the con man's art. Based on the victim impact letters, Sample's results have been mixed. Sample has portrayed his scheme as the victims' only hope of ever recovering the money owed to them. In doing so, he told them that the job he apparently currently has "continues to provide the means for substantial restitution," Exhibit 11, but he failed to tell them what he told the bankruptcy court: that based on his income after expenses, he actually only has $65 a month left from his income to pay all of his creditors. Exhibit 12 (Sample's bankruptcy petition) at 10. At this point, his promises of full repayment

seem little more than a pipe dream.  It is cruel sport indeed to traffic in false hope for victims who are already emotionally spent.

In addition to his emotional haranguing of his victims long after the fraud, there is also principle at stake.  Even assuming for the sake of argument that Sample was somehow able to raise the money to pay restitution, it would be fundamentally unfair for defendants who have higher earning capacities to be permitted to serve less time in prison for their crimes than those whose future economic prospects are more limited.  "Restitution is desirable but so . . . [are] limits on the ability of those with money or earning potential to buy their way out of jail." *Mueffelman*, 470 F.3d at 40.  It is also counterintuitive to give lesser sentences to those who have inflicted greater economic harm on their victims.  *See United States v. Treadwell*, 593 F.3d 990, 1012 (9th Cir. 2010) (noting that it would be "a strange rule" for defendants who cause large losses "to receive light sentences in order to facilitate their unrestrained work towards restitution").

<u>Conclusion</u>

Sample has failed to present any credible, compelling or persuasive argument for imposing a sentence outside of the advisory guideline imprisonment range.  Sample's actions were abhorrent, cruel and inexcusable.  Sample wrecked lives and most of his victims will likely continue to suffer greatly for years for what he did to them.  Without a doubt, Sample deserves a guideline sentence.  Any downward departure or variance would be an injustice.  Taking into account all of the required sentencing factors under section 3553, the 78-month term of

imprisonment called for under the guidelines for Sample's selfishness in betraying his victims' trust is an appropriate, fair and just sentence.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

*/s Fred J. Federici*
FRED J. FEDERICI
Assistant U.S. Attorney
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274
(505) 346-7296 fax

<u>CERTIFICATE OF SERVICE</u>

I hereby certify this 18th day of November 2016 that a copy of this document was filed electronically via CM/ECF, a system designed to serve counsel of record.

*/s Fred J. Federici*
FRED J. FEDERICI

## INDEX TO EXHIBITS

Exhibit 1:      HGTV DVD of Sample's mountain home in Santa Fe

Exhibit 2:      Victim impact letter to the Court from R.L.

Exhibit 3:      Dec. 16, 2014 letter from Sample to the SEC seeking to have SEC bar lifted

Exhibit 4:      Sept. 2014 letter to Lobo investors from Sample requesting victims to send form letter to the SEC supporting his request to have SEC bar lifted

Exhibit 5:      Excerpt from SEC's February 4, 2015 denial of Sample's request to have SEC bar lifted

Exhibit 6:      Oct. 3, 2014 email to G.H. from Sample asking for the H's support to have the SEC bar lifted

Exhibit 7:      Sept. 29, 2014 victim letter to the SEC from M.R.

Exhibit 8:      Aug. 4, 2015 victim letter to E.H. and S.H. from Sample

Exhibit 9:      Victim impact letter to the Court from L.D. and B.D.

Exhibit 10:     Nov. 16, 2015 victim letter to E.H. and S.H. from Sample

Exhibit 11:     Jan. 26, 2016 victim letter to E.H. and S.H. from Sample

Exhibit 12:     Excerpts from Sample's November 24, 2015 bankruptcy petition

Exhibit 13:     Excerpts from Sample's June 2, 2014 affidavit to SEC that is cross-referenced in the plea agreement

Exhibit 14:     July 31, 2014 letter to the SEC from Sample

Exhibit 15:     November 17, 2014 Sample affidavit for the SEC

Exhibit 16:     Feb. 29, 2012 email to from F.H. to Sample

Exhibit 17:     June 22, 2012 email to from F.H. to Sample

Exhibit 18:     Sept. 29, 2012 email from E.H. to Sample

Exhibit 19:     Transcript excerpts from April 24, 2014 FBI interview of Sample

Exhibit 20:     Jan. 27, 2016 letter to E.H. from Sample's bankruptcy attorney

Exhibit 21:     1&1 Internet, Inc. business records for bogus www.bsicap.com website

Exhibit 22:     Victim impact letter to the Court from N.C.

Exhibit 23:     Victim impact letter to the Court from P.C.

Exhibit 24:     Dated images from Sample's Facebook page

Exhibit 25:     1&1 website page

Exhibit 26:     July 31, 2013 email from Sample to attorney Ed Tomko

Exhibit 27:     Victim impact letter to the Court from G.H. on behalf of E.H. and S.H.